[Crim. No. 7509.    Second Dist., Div. Three.    Aug. 18, 1961.]

THE PEOPLE, Respondent, v. CLAUDE JOHN SCALLION, Appellant.

Richard A. Haley for Appellant.

Stanley Mosk, Attorney General, and A. Douglas MacRae, Deputy Attorney General, for Respondent.

VALLÉE, J.—A jury found defendant guilty of robbery of the first degree and found he was not armed at the time of the robbery.  On motion for a new trial the court reduced the offense to robbery of the second degree and denied the motion.

Defendant appeals from the judgment and the order denying a new trial.

About 9:30 a. m. on Friday, February 27, 1959, Howard Kerr, who owned a service station and operated a check-cashing service, left his place of business to go to the First City Bank of Rosemead. The bank was located on the southeast corner of Rosemead and Valley Boulevards in Los Angeles County. Kerr was accompanied by Maurice Mistich, his uniformed guard. Mistich was supplied by a detective agency and was armed with a revolver. He had accompanied Kerr to the same bank on two previous Fridays at about the same time.

At the bank Kerr received $20,000 in cash, most of it in currency. He put $7,000 in a canvas moneybag bearing the bank's stamp. He left the bank followed by Mistich at a distance of about 5 feet. As he proceeded along the sidewalk he saw defendant between himself and an alley lounging against the wall of the bank, looking in his direction. As Kerr passed, defendant straightened up, walked quickly to Kerr, grabbed his left arm and began striking him about his arms and mid-section. Kerr yelled "Help, help. It's a holdup," and struggled with defendant who was attempting to propel him toward the alley. He noticed another man approach with a gun pointed at him. Kerr ducked his head and was slugged four or five times on the back of his head with a hard object. Defendant was holding him and the moneybag. Kerr let go of the bag, and defendant and the man with the gun ran into the alley.

Kerr kept yelling, "Help. It's a holdup." Defendant and the other man ran toward what appeared to be a dark colored 1950 Dodge sedan. One of the men aimed the revolver at Kerr. Kerr ducked down behind a car and heard a shot. The car pulled away. About that time Mistich came up. The car was still in sight. Kerr said to Mistich, "Shoot those fellows. Shoot them. Shoot at the car." Mistich replied, "They took my gun."

At the sheriff's office after defendant's arrest, Deputy Sheriff Rowley, Kerr, and defendant being present, Kerr said of defendant, " 'That's the man who jumped me outside the bank and where I was robbed.' " Defendant "remained silent."

The defense was an alibi.

Defendant's only assignment of error is that the district

attorney was guilty of prejudicial misconduct in five par-
ticulars.

1. Mistich was a codefendant, also charged with the
robbery. The first assignment of misconduct has to do with
a photograph of defendant. Deputy Sheriff Rowley was
testifying to a conversation he had with Mistich when this
occurred on his direct examination by the district attorney:
"Q. At any time during that conversation did you exhibit any
photographs to Mr. Mistich? A. Yes, sir, I did. I showed
him pictures of the defendant Scallion and one of William Lee
Holmes. Q. The picture of a fellow by the name of Holmes,
is that the one that has been marked for identification as
People's No. 10? A. Yes, sir. Q. That is the picture that you
exhibited to him, is that correct? A. That's correct. Q. Do
you have the picture of the defendant Scallion that you ex-
hibited to Mr. Mistich? A. Yes, I do. Q. Do you have it here
with you in the courtroom? A. Yes, I do. Q. Would you step
down, please, and find it? MR. JOHNSON: This is a photo-
graph of what appears to be the defendant Scallion. May it
be marked for identification next in order as People's No. 12?
THE CLERK: That would be 11. MR. JOHNSON: Yes. Mr.
Overton is correct, your Honor. That would be No. 11. I was
in error. THE COURT: 11 for identification only. MR. HALEY:
That is objected to as—— it is not being offered at this time.
That's all right. MR. JOHNSON: I am writing over the '12'
that I put on the back and am placing in ink the number
'11' here. MR. HALEY [attorney for defendant]: Now, if the
Court please, I am going to object to counsel's going any
further with this situation now on the ground that it is an
obvious attempt to prejudice the jury against Mr. Scallion."
It is contended the district attorney was guilty of prejudicial
misconduct in referring to the photograph of defendant.

Defendant moved for a mistrial. In denying the motion
the court stated, "If there had been any previous objection
made to the use of the photograph, if there had been any con-
sistent use of it, I would have granted the motion, but in view
of the fact that there has never been any attempt made to stop
the use of it or any objection made, the motion for mistrial
will be denied, and I instruct the District Attorney to make no
further use of the photograph at this time." The court then
instructed the jury to disregard completely any references to
any photograph purporting to be that of defendant. No
further reference to the photograph was made. We find no
prejudicial misconduct in the incident.

2. Sergeant Rowley testified that on May 4, 1960, he and Sergeant Miner had a conversation with Mistich. Before he related the conversation on the request of the district attorney, the court instructed the jury thus: "The making of these statements will be received in evidence only as against the defendant Mistich and is not to be received as to the defendant Scallion." When the witness was asked to relate the conversation, defendant's counsel said, "At this time we object on behalf of the defendant Scallion as hearsay evidence." The objection was sustained, the court stating, "As the jury has previously been cautioned, this evidence is being offered and is being received only as far as the defendant Mistich is concerned." The witness was then examined on *voir dire* by counsel for Mistich, during which it appeared the witness had talked to Mistich about 9 a. m. and again at noon and that there was a gap from about 9:30 a. m. until noon. Counsel for Mistich then objected to the witness' relating the conversation. Proceedings were then had in the absence of the jury in which the district attorney stated that counsel for Mistich appeared not to be aware "of the fact that in this gap there was a period of time when the witness was on a lie-detector test. Now, I specifically instructed this witness to refrain from any mention of a polygraph or lie-detector test, feeling it might prove prejudicial to the defendants." In the colloquy, counsel for defendant stated: "In the preliminary transcript, where this officer testified with reference to this document that has been transcribed, there is reference to Mr. Scallion, and I would ask the District Attorney if he could instruct his witness—— since you are laying a foundation to introduce a written document, is that true?" The district attorney answered, "Yes," and said, "I intend to have him relate the oral conversation and then there was this conversation that was reduced to writing with the shorthand reporter present." The following then occurred: "Mr. HALEY [attorney for defendant]: Could the witness be instructed not to, in his oral testimony, refer to Mr. Scallion, for this reason: I do hope to talk the jury into the idea that when they do retire to deliberate, to deliberate on Mr. Scallion first, and if they don't know what is in this other document, they would reach a decision quicker, and they wouldn't have to cast it out of their minds, which is almost an impossible thing to do. Mr. JOHNSON: I think that is a strange, improper suggestion, that the witness be instructed to edit a confession that was made to him, to delete the name of one of the co-con-

spirators. Mr. Haley: Well, I will object on the ground that the document is the best evidence. The Court: The objection will be overruled at this time subject to being renewed as to any particular point at any particular question."

The witness then related the conversation. In part he testified: "I walked into the room, along with Sergeant Miner, sat down, and I said, 'Maurice, I understand that you want to tell us something now.' And he said, 'Yes, that's correct.' He says, 'Those are the guys that pulled the job, and I had talked to them and we had set it up.' I said, 'Well, where did you first meet these fellows?' And he stated that he had been working at the Clock Drive-In, in Pasadena, one night when the other fellow that had been working for Mr. Post brought Scallion and Holmes in in a car with two or three other people, that this other fellow by the name of Dave Tremaine had introduced Scallion and Holmes to Mistich, and they had agreed to hold up Mr. Kerr. He said, 'They told me to just act like I was being stuck up and they'd take my gun and tell me there was a guy across the street with a shotgun.' He says, 'I didn't know that they was going to hit Mr. Kerr.' "

Shortly after the conversation testified to, Rowley had another conversation in the presence of a reporter who took it down and transcribed the notes. Mistich signed the statement. There was some reference to defendant in the statement. The district attorney said he was going to ask Rowley to read the statement. Counsel for defendant objected to the statement being read in evidence. After a colloquy the court instructed the witness not to read the parts which referred to defendant. Counsel for defendant said he had no objection to the reading of the statement with those parts eliminated. On stipulation of all counsel the court read the statement in evidence. No part of the statement, as read, made any reference to defendant. At the conclusion of the reading the court told the jury the statements were received "in evidence solely as against the defendant Mistich and are not to be considered by you in any way as against the other defendant." We find no error in the foregoing. The court had told counsel for defendant that objection would be entertained at any particular point, but no objection was made nor was any motion made to strike the references to defendant in the conversation. Further, while the jury were deliberating they returned to the courtroom and asked the court whether the signed state-

ment of Mistich could be taken "as evidence against Mistich only" or whether it could "be used against Scallion." The court answered, saying: "Where evidence has been received of statements by Maurice Hewitt Mistich, one of the co-defendants, after his arrest, and in the absence of his co-defendant Claude John Scallion, such statement can be considered only as evidence against the defendant Mistich, who made such statement, and cannot be considered for any purpose as evidence against his co-defendant Scallion. That applies to the statements made outside of court but does not apply to any testimony which Mr. Mistich may have given here on the stand." We must assume, of course, that the jury followed the admonition of the court with respect to the statement.

3. In the transcribed statement of Rowley's conversation with Mistich, this appeared: "Q. After they took the money, where did they go? A. I don't know, probably back to Bakersfield. . . . Q. You lived in Bakersfield yourself three or four years, didn't you? A. Uh-huh. Q. And you say these guys were going back to Bakersfield? A. Yeah. The way I understand it, they were from Bakersfield." On further direct examination of Rowley, he stated he had a conversation with defendant. Then this occurred: "Mr. Johnson [District Attorney]: This will be offered only as to the defendant Scallion, your Honor. The Court: All right. This particular testimony will be received only as against the defendant Scallion. It is not to be considered at all as against the defendant Mistich. Q. By Mr. Johnson: Sometime during the conversation with the defendant Scallion, was some mention made of witnesses in Bakersfield? A. Yes, there was. Q. Will you tell what it was that you said and what it was that Mr. Scallion said with respect to those witnesses? A. We had asked defendant Scallion about this robbery. He had denied it and said that he would produce witnesses to show that he was in Bakersfield on the day that this robbery occurred. Q. And did you say anything then? A. We asked him who the witnesses were, and he said, well, he would get them, that we could get them from his attorney, or something to that effect. Q. Was the matter then dropped at that point? A. It was. Q. As far as inquiring as to the identity of the witnesses, there was no further inquiry on your part, is that right? A. I don't remember whether he said we could get them from his attorney, but we would have to deal through his attorney, or some words to that effect. Mr. Johnson: You may cross-

examine.  CROSS-EXAMINATION BY MR. HALEY:  Q. Officer, didn't he tell you that he had to be out on bail because he had to get his witnesses from Bakersfield?  Isn't that the conversation?  A. Yes, sir, I believe he did make that statement one time."  Error is claimed because of the reference to witnesses from Bakersfield.

On motion of counsel for defendant, all of these questions and answers were stricken and the court on its own motion instructed the jury "to disregard at this time any and all statements regarding witnesses from Bakersfield."  Since there were references in the testimony of Rowley as to his conversation with Mistich to the men who were with Mistich at the time of the robbery going back to Bakersfield, which were hearsay as to defendant, it was improper for the district attorney to question Rowley with respect to witnesses in Bakersfield.  This is particularly true in view of the fact that in the short conversation with Rowley defendant denied participation in the robbery and said he was in Bakersfield the day it occurred.  Defendant did not object to the questions and cannot complain.  He could have obviated any error by an objection.  In view of the failure to object, of the cross-examination, the prompt instruction of the court, we do not think the interrogation was prejudicial.

4. The "Green Door" was a bar and poker club in Bakersfield.  Three witnesses placed defendant in the Green Door working there at the time of the robbery.  Defendant testified he was there.  William Holmes, defendant's brother-in-law, worked at the Green Door during the month of February 1959.  Defendant's uncle was employed at the Green Door.  He identified a photograph as one of Holmes.  Defendant testified he had a brother-in-law by the name of Holmes.  Kerr testified the person in the photograph resembled one of those who robbed him.  Mistich testified the person in the photograph resembled the person who took his gun and pistol-whipped Kerr.  There was evidence Holmes owned a dark-colored 1950 Dodge.

In his closing argument to the jury the district attorney stated:

"[T]here was certain testimony that was not received for a limited purpose, and that is the testimony from Mr. Scallion's own lips, that he does have a brother-in-law by the name of Holmes, and that, taken in connection with the testimony of Mr. Mistich and Mr. Kerr that the person in that

photograph resembles the one who committed the robbery, then that does have very great significance.

"It goes further than that. The testimony from Mr. Scallion's lips, and others, was to the effect that Mr. Holmes was employed at the Green Door on the day or around the time of the robbery, and much further than that, that he did have a 1950 Dodge and that it was of a dark color. Now, this testimony was not received for a limited purpose. It is a web of circumstances, that is, circumstantial evidence that does connect the defendant very, very directly to the commission of the crime.

"Just a moment ago I commented on the fact that Mr. Mistich had said that Holmes resembled the person who took his gun and then pistol-whipped Mr. Kerr. I say to you that has very, very great weight when it comes from a person such as Mistich in this case. When he identifies the photo and states that there is a resemblance there, I think you can pretty well conclude that there is something more than a resemblance. He had a very good look at that individual. I say a very good look. You will have to pass upon that in your consideration of the facts, but he did see that individual as he walked south away from him. He did see that individual as he was struggling with Mr. Kerr. I say to you that he did have a very good look at him and that he would remember him and he does at this time, and by stating that that photo, the photo identified as Mr. Scallion's brother-in-law—when he says that that photo resembles the person, you can pretty well conclude that that is Mr. Holmes and that that is the person who committed the crime along with the defendant Scallion."

The photograph referred to was not received in evidence; it was marked for identification only. Defendant asserts the district attorney was guilty of prejudicial misconduct in using "the photograph as a basis for the most forceful portion of his entire argument to the jury."

Counsel for defendant did not object to the argument of the district attorney or assign it as error or request the court to instruct the jury to disregard it at the time it was made. Following the closing argument of the district attorney a recess was taken. During the recess, in the absence of the jury, counsel for defendant stated: "I did not at that time object, for this reason: I believe that that can be cured by a special instruction from the Court to the effect that none of the criminality of Mr. Holmes may be—that is, none of the

criminality of Mr. Holmes as evidenced by the various statements and testimony that has been given as against Mr. Mistich and not against Mr. Scallion should *not* and can*not* be used by the jury. As a matter of fact, that is what I predicated my whole argument on to the jury. I believe that if the Court does specially instruct the jury on that point, it would be all right." He said if the instruction was not given he was going to make a motion for a mistrial. The court, assuming a motion for a mistrial had been made, denied it. The court then prepared instructions to cover the matters objected to and counsel for defendant indicated satisfaction with them. Pertinent instructions given are quoted in the margin.[1] Under the circumstances, we do not believe the argument of the district attorney was prejudicial.

■■■ 5. Elaine Pedersen was called as a witness for defendant Mistich. She said she drove Mistich to work the morning of the robbery. On cross-examination she testified: "Q. How long did you say you have been living with the

---

[1] "Where evidence has been received against one of the defendants but is not received as against the other, the jury may consider such evidence only as against the defendant against whom it was permitted to be received. It may not be considered by the jury for any other purpose, or against any other defendant, nor may any inference be drawn therefrom unfavorable to the other defendant."

"Where evidence has been received of statements by Maurice Hewitt Mistich one of the defendants after his arrest and in the absence of his co-defendant Claude John Scallion such statement can be considered only as evidence against the defendant Mistich who made such statement and cannot be considered for any purpose as evidence against his co-defendant Scallion."

"Likewise an accusatory statement or confession by one alleged to be a participant in the robbery in question but who is not present as a witness in court is not to be considered in itself as proving its truth but is only received to explain the admissions, if any, of a defendant in response thereto and is admissable even for such limited purpose only as against a defendant who is claimed to have made such an admission."

"When a person on trial for a crime shows that he was in another place at the time when the crime alleged was committed, he is said to prove an alibi. The defense interposed by the defendant Scallion in this case is what is known as an 'alibi,' that is, the defendant Scallion was in another place at the time of the commission of the [c]rime. All of the evidence [b]earing on that point should be carefully considered by you. If in view of all the evidence you have a reasonable doubt as to whether the defendant was in some other place when the crime was committed, you should give him the benefit of that doubt and acquit him."

The court also instructed the jury that "if any counsel intimated by any of his questions that certain hinted facts were or were not true, you must disregard any such intimation, and must not draw any inference from it. As to any statement made by counsel in your presence concerning the facts in the case, you must not regard such a statement as evidence. . . ."

defendant Mistich? A. Oh, I'd say for a year"; during the weeks and months prior to February 1959 she was employed at the Manger Café; she said she had seen defendant "not more than once or twice"; "Q. Thank you. Now, when you say you can't remember where or when, can you be any more specific than that? Would it be in the last year, prior to a year ago, around February 27, 1959, or when? A. It would have to have been over a year ago" (her testimony was given on August 2, 1960). She testified the Manger Café was probably the only place she could have seen him. When asked if she saw defendant with Mistich "on those one or two occasions," she replied, "I couldn't say. I don't remember." She testified further: "Q. When you say that you have seen Mr. Scallion before, do you remember positively of having seen him, or do you just have the impression of having seen him? A. No, I definitely say I've seen him."

In his argument to the jury the district attorney stated counsel for defendant had attempted to summarize the testimony of Elaine Pedersen but had omitted to mention that she had seen defendant in the Manger Café, that she had seen him there "once or twice," that "it was something over a year ago," and that was just about the time defendant Mistich and Holmes were conspiring to commit the robbery, and "Would she be likely to remember an individual whom she had seen in conversation with Mr. Mistich? Much more likely. Now, that makes sense."

Defendant contends the district attorney deliberately misquoted the testimony of Elaine Pedersen to the jury. We think not. The argument was fair comment on the evidence and reasonable inferences to be drawn therefrom.

On the entire case, we cannot find that the asserted misconduct was prejudicial in character.

The judgment and order denying a new trial are affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied September 15, 1961, and appellant's petition for a hearing by the Supreme Court was denied October 11, 1961.